IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| Lilian Fuentes-Ortega, on her own behalf and on behalf of her minor children, H.Y.L.F. and B.M.L.F., | ) ) ) ) | Civil Action No. 4:20-cv-00266-MLB |
| Plaintiffs, | ) | |
| v. | ) ) | |
| United States of America, | ) ) | |
| Defendant | ) | |

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.     This action seeks damages for the minor children, H.Y.L.F. and B.M.L.F., caused by the United States government forcibly separating them from their mother, Lilian Fuentes-Ortega, when they lawfully entered the United States to seek asylum.  In all, H.Y.L.F. and B.M.L.F. were separated from their mother and deprived of her love, care, and support for one year, eight months, and fourteen days.

2.     This action also seeks damages for Lilian Fuentes-Ortega caused by the United States government's separation of her from her children.

3.     The United States government separated Lilian Fuentes-Ortega from H.Y.L.F. and B.M.L.F. as part of a barbaric family separation policy designed by

the Trump Administration to inflict severe emotional distress with the goal of deterring parents and children from seeking asylum in this country.

4.     The Biden Administration has condemned "the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents…."[1] Yet, the Biden Administration, in response to actions such as this, continues to defend the legality of the family separation policy and deny remedies to its victims.

5.     H.Y.L.F., B.M.L.F., and Lilian Fuentes-Ortega (collectively, "Plaintiffs") bring their claims against the United States government under the Federal Tort Claims Act, 28 U.S.C. § 1346.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

7.     Plaintiffs have exhausted their FTCA claims. Plaintiffs filed all required administrative forms with each of the relevant agencies of the United States of America more than six months ago. There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem

---

[1]  See Executive Order on the Establishment of Interagency Task Force on the Reunification of Families, Feb. 2, 2021, available at https://www.whitehouse.gov/briefing- room/presidential-actions/ 2021/02/02/ executive-order-the-establishment-of-interagency-taskforce-on-the-reunification-of-families/ (last accessed on April. 20, 2021).

those claims denied pursuant to 28 U.S.C. § 2675(a).

8.      Plaintiffs reside in this district, and a substantial portion of the acts and omissions giving rise to the claims occurred in this district. Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).  Further, this district is the most convenient forum for this action, and transferring this action to a distant jurisdiction would violate Plaintiffs' equal protection rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

## PARTIES

9.      Plaintiffs are Guatemalan nationals who currently reside and are domiciled in Chattooga County, Georgia.  Plaintiff Lilian Fuentes-Ortega ("Lilian") brings this action on behalf of herself and her minor children, H.Y.L.F. and B.M.L.F.

10.      At all relevant times, Plaintiffs were monolingual Spanish speakers.[2]

11.      Plaintiffs only have very meager financial resources.  Lilian earns $14.30 per hour at her current job.  With this income, she must care for H.Y.L.F. and B.M.L.F.  Lilian's hourly wage is approximately 45 percent of what is considered a living wage in Chattooga County, Georgia.[3]

---

[2]  H.Y.L.F. and B.M.L.F. have since learned some limited English in school.

[3] *See* Amy K. Glasmeier, *Living Wage Calculator for Chattooga County, Georgia* (Massachusetts Institute of Technology 2021), https://livingwage.mit.edu/counties/13055 (last visited Apr. 20, 2021)("[t]he

12.     On or about August 8, 2019, U.S. Immigration and Customs Enforcement ("ICE") released Lilian from detention under an order of supervision.  The terms of her order of supervision, which remain applicable to date, require her to wear a GPS ankle monitor and to regularly check in with the local ICE field office.  She also cannot leave the state of Georgia without prior permission from ICE.  It is fully within ICE's discretion to grant or deny that permission.

13.     Upon information and belief, Lilian's order of supervision lists her Chattooga County, Georgia address.

14.     In November 2017, Lilian fled to the United States with H.Y.L.F. and B.M.L.F, seeking asylum.

15.     H.Y.L.F. is an eleven-year-old boy.  He is Lilian's son.  At the time U.S. Customs and Border Patrol ("CBP") separated him from Lilian, he was eight years old.

16.     H.Y.L.F. has an application for asylum and for withholding of removal pending before U.S. Citizenship and Immigration Services ("USCIS").

17.     B.M.L.F. is a fourteen-year-old boy.  He is Lilian's son.  At the time U.S. Customs and Border Patrol ("CBP") separated him Lilian, he was twelve

_____
living wage shown is the hourly rate that an individual in a household must earn to support his or herself and their family.").

years old.

18.     B.M.L.F. has an application for asylum and for withholding of removal pending before USCIS.

19.     Defendant United States of America is a proper defendant under the FTCA. *See* 28 U.S.C. §§ 1346(b), 2671, *et seq*. The United States is sued for the Plaintiffs' personal injuries, caused by the wrongful acts or omissions of its employees, including employees of the Department of Health and Human Services' Office of Refugee Resettlement; the Department of Homeland Security (DHS) and its constituent units, CBP, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"); and the contractors that the agencies directly supervised. Those employees and contractors were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the places where the act or omission occurred. *See* 28 U.S.C. § 1246(b).

## STATEMENT OF FACTS

### A.     The Government's Family Separation Programs

20.     Curbing the number of individuals seeking asylum in the United

States was a central focus of the Trump Administration's immigration policy.[4]

21.    To that end, in July 2017, the government established a family separation pilot program in CBP's El Paso sector, through which it targeted for criminal prosecution parents who crossed the border with children. It detained the parents and forcibly took their children away from them, designated the children as unaccompanied minors (despite their having arrived with their parents), and placed the children in the custody of ORR, a component of HHS. Through this initiative, the government separated 281 individuals between July and November 2017.

22.    By late 2017, the government was separating families along the length of the U.S.-Mexico border, including families arriving in the United States outside the El Paso sector.[5]  Plaintiffs were among those families.

---

[4] See, e.g., *U.S. Judge Bars Trump Administration from Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephenmiller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylumseekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a33217240a539_story.html; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019.

[5] *See Ms. L. v. U.S. Immigrations and Customs Enf't*, 310 F. Supp. 3d 1133, 1142-45, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019).

23.    On April 6, 2018, then Attorney General Jeff Sessions announced that the government would institute a "Zero Tolerance" mandate, requiring the prosecution of all persons who crossed the United States border between ports of entry.[6]

24.    The Administration knew family separation would cause enormous trauma to the children and parents. Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate. Administration officials at the highest levels thus planned and implemented a practice of separating families both knowing that the practice would cause severe harm to the people it affected and specifically intending that it would cause such harm.[7]  For example:

  a.    In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be paramount in all custody decisions regarding family

---

[6] *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry*, Dept. of Justice (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[7] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); see also Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officialswho-have-said-that-family-separation-is-meant-as-a-deterrent/.

members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[8]

b.     Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the practice that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[9] Administration officials ignored Commander White's warnings.

c.     In March 2017, several DHS officials told the press that the department was considering a program of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States.[10] The day after the press report, the American Academy

---

[8]    U.S. Immigration & Customs Enf't, Dep't of Homeland Sec., Rep. of the DHS Advisory Committee on Family Residential Centers 2 (2016), available at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[9]    Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administrationwas-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White).

[10]    Julia Edwards Ainsley, *Exclusive: Trump Administration Considering*

of Pediatrics responded with a statement opposing DHS's proposed family

separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared children.[11]

25.     Despite the dire warnings about the effects of this practice, numerous

high-level officials publicly admitted that family separation was the express

guiding principle and that its purpose was to harm asylum seekers arriving in the

United States so as to deter future asylum seekers. For instance: When an NPR

reporter asked about the program on May 11, 2018, John Kelly, President Trump's

then-Chief of Staff, responded that "a big name of the game is deterrence. It could

be a tough deterrent."[12] As for the children affected, he said: "[t]he children will

---

*Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-childrenidUSKBN16A2ES.

[11] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-pressroom/ Pages/immigrantmotherschildrenseparation.asp.

[12] *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interviewwith-npr.

be taken care of — put into foster care or whatever."[13]

26.     On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[14]

27.     Accordingly, from 2017 and throughout much of the Trump Administration, senior government officials made the express choice to intentionally cause parents (including Lilian) and children (including H.Y.L.F. and B.M.L.F) extraordinary pain and suffering in order to accomplish the government's objectives.

28.     A Physicians for Human Rights ("PHR") investigation, based on psychological evaluations of asylum-seeking parents and children who were separated by the U.S. government in 2018, found the U.S. government's treatment of asylum seekers through its family separation policy constituted cruel, inhumane, and degrading treatment and, in all cases evaluated by PHR experts,

---

[13] *Id.*

[14] Philip Bump, *Here are the Administration Officials Who Have Said that Family Separation is Meant as a Deterrent*, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-theadministration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

rose to the level of torture.[15]

29.     Family unity is a fundamental principle of child welfare law and recognizes that in order to thrive, children must remain in the care of their families where they are loved, nurtured, and feel safe. As such, the separation of Plaintiffs from each other violated their constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, see, e.g., *Quilloin v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents, see *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

30.     ICE and CBP have well-established legal obligations to ensure the

---

[15]   *You Will Never See Your Child Again: The Persistent Psychological Effects of Family Separation*, PHR, February 2020, https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf ("PHR Report"); *see also United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Dec. 10, 1984, 1465 U.N.T.S. 85, 113; S. Treaty Doc. No. 100-20 (1988)(defining torture as an act 1) which causes severe physical or mental suffering, 2) done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence). In the cases that PHR documented, U.S. officials intentionally carried out actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner. *See* PHR Report.

prompt release of minors in their custody and to favor preserving family unity whenever possible. *See Flores v. Reno*, CV 85-cv-4544, ECF. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* consent decree remains binding on the United States and significantly limits the circumstances, duration, and manner of immigration detention of minor children.

31.    The *Flores* consent decree imposes standards for the treatment of detained minors and recognizes their vulnerability of being detained without a parent or guardian. It requires, among other matters, that immigration officers permit minors contact with family members who were arrested with the minor. DHS and its agents violated its obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity and instead needlessly separating Plaintiffs from each other.

32.    CBP officers generally carried out separations of parents and children under the family separation program at various immigration detention sites near the southwestern border.

33.    Immigration officials frequently put arriving parents and children in cells in short-term detention centers and told the parents that immigration officials would take their children.

34.    Immigration officials often told parents that they committed a crime by crossing the border, regardless of the circumstances of their entry.

35.    Many parents waited in terror as they watched immigration officials take children from their parents, knowing that their children's names might soon be called.

36.    If the parents did not willingly hand their children over to immigration officials, the officials often forcibly ripped the children out of their parents' arms.

37.    Immigration officials separated children as young as infants and children as old as 17 from their parents, without regard to age or language ability.

38.    In many cases, parents begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's anguish.

39.    After forcibly separating family units, many parents watched immigration officials separate other parents and children after they were separated from their own children, compounding the trauma.

40.    In many cases, immigration officials flew children thousands of miles away from their parents under the pretense that the separation was the necessary result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

41.     After forcibly separating family units, CBP transferred many parents into ICE custody.[16]

42.     As predicted by then- Secretary John Kelly, ORR staff then placed the children in "foster care or whatever." The "whatever" included placement of many children in ORR facilities throughout the United States.

43.     When the children were separated, the government classified them as "unaccompanied," even though they had been accompanied by their parents when they arrived in the United States seeking asylum and remained accompanied until the government separated them from their parents and transferred the children to ORR custody. ORR is responsible for the longterm custodial care and placement of "unaccompanied alien children." *See* 6 U.S.C. § 279(a).

44.     Parents suffered physically, mentally, and/or emotionally during the separation from their children.

45.     Likewise, children separated from their parents suffered physically, mentally, and/or emotionally. This trauma was aggravated by the fact that many children did not understand why they had been separated and some believed their

---

[16]   Office of The Inspector General, U.S. Dep't Of Homeland Security, OIG-18-84, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 2-3, 13, 15 (Sept. 27,2018) ("DHS OIG Report").

parents had abandoned them.[17]

46.     Serious psychological harm to children and families was a foreseeable result of Department of Homeland Security's implementation of the forced family separation policy.

47.     It was within the government's power to prevent separation through use of alternatives to detention, to reduce the duration of separation through a reunification plan, and to ensure timely information about the wellbeing, whereabouts, and contact information for children and parents by setting up appropriate information and communications channels.

48.     Instead, the U.S. government took no reasonable measures to minimize the predictable psychological harms which resulted from its program to separate parents and children.

49.     In many cases, individuals employed by the U.S. government similarly did not take additional measures to prevent these harms.

50.     The government's failure to utilize proper record keeping of the separated families led to more chaos. As emphasized by the Honorable Dana M.

_____

[17] Office of the Inspector General, U.S. Dep't Of Health & Human Servs., Oei-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (Sept. 2019) ("HHS OIG Report II") ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").

Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> [t]he government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property. Certainly, that cannot satisfy the requirements of due process.

See *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part, denied in part sub nom. Ms. L. v. ICE*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).

51.     On June 26, 2018, in *Ms. L*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days. *Id.* at 1149.

52.     Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the children didn't know where the parents were. And the government didn't know, either."[18] Judge Sabraw found that the government's family separation violated the constitutional right to family integrity.[19]

53.     As evidenced by Administration officials' statements that the program's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this program to intentionally inflict emotional distress on the parents and children whom it separated. It succeeded, with devastating consequences for Plaintiffs.

---

[18]  Transcript of Status Conference at 58, Ms. L., No. 18-cv-00428 DMS MDD (S.D. Cal. July 27, 2018), ECF No. 164.

[19]  See Ms. L. v. U.S Immigration & Customs Enf't, 302 F. Supp. 3d 1149, 1161-1167 (S.D. Cal. 2018 (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); see also Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

**B.** **Plaintiffs come to the United States seeking asylum.**

54.     In early November 2017, Lilian, H.Y.L.F., and B.M.L.F. fled Guatemala.  In Guatemala, they had been subjected to severe abuse and violence at the hands of H.Y.L.F. and B.M.L.F.'s father, who was a police officer, and Lilian's stepfather, who had threatened to kill her.

55.     Lilian took the drastic step of escaping from the only country she had known because she feared her life and the lives of H.Y.L.F. and B.M.L.F. would be at risk if they remained.

56.     After a journey across Mexico, Plaintiffs crossed into the United States on or about November 25, 2017 at Alta Sonora, Arizona.

57.     Plaintiffs viewed the United States as a place where they would be able to seek refuge in safety.  Though nervous, they were happy when they entered the United States because, at the time, they believed they were leaving all of the hardship and violence behind them.

58.     Instead, the United States government saw to it that they would find neither refuge nor safety.

59.     Plaintiffs fell victim to a deliberate United States government program using the cruelty of forced family separation to deter them and future migrants from seeking asylum.

60.     Upon entering the United States, Plaintiffs looked for and found a

CBP sentry station, turned themselves in, and told a CBP officer they were

seeking asylum.

61.     CBP then detained Plaintiffs and put them in a secured van.

62.     While in the van, H.Y.L.F. and BMLD became upset and scared.

Lilian tried to reassure them by telling them everything would be okay.

**C.      CBP Imprisons Plaintiffs in an "Ice Box."**

63.     CBP, transported Plaintiffs in the van to a CBP holding center.

64.     The CBP holding center is commonly referred to as an "Ice Box"

because temperatures inside are very cold.

65.     When Plaintiffs arrived at the Ice Box, CBP placed them in a large

room with about four other mothers and their children.

66.     The room only had two metal benches where the Plaintiffs and other

detained families could sit.

67.     The room was all concrete and did not have any windows allowing

in natural light.  The only window allowed a view from another room.  CBP

officers used the window observe the families detained in the room.

68.     The temperature in the room was very cold.  Plaintiffs were

shivering and not able to warm up while they were in the room.

69.     The lights were always on in the room.

70.     The toilets in the room were visible to everybody.  The other families

in the room could see Plaintiffs urinate and defecate.

71.     CBP did not provide Plaintiffs with a bed, cot, sheets, blankets, or pillows.  Instead, CBP only provided Plaintiffs with a thin mattress and aluminum foil-like tarps to use as bedding.  Plaintiffs either had to sleep on the thin mattresses and tarps directly on the cold, concrete floor, or on the metal benches because they were a little warmer.

72.     Plaintiffs were hungry when they arrived at the Ice Box.  CBP did not provide Plaintiffs with adequate food.  They were only given a small burrito and a juice box after about three hours.

73.     When H.Y.L.F. started chewing on his burrito, he noticed there was trash—possibly part of the burrito wrapper—in his mouth.  He spit out the trash.  A CBP agent yelled at H.Y.L.F.  in Spanish, in front of the other families, "What are you doing?  Take off your sweater and clean my floor!"  H.Y.L.F. was frightened, trembling, and sobbing.

74.     When the CBP officer yelled at H.Y.L.F., Plaintiffs were terrified.  They thought the CBP agent was going to physically attack H.Y.L.F.. Fearing for his safety—and particularly because he had witnessed and experienced violence in Guatemala—H.Y.L.F., still trembling, took off his sweater and used it to clean the floor.

75.     Though conditions at the Ice Box were terrible, Plaintiffs were able

to provide each other some minimal physical and emotional comfort: leaning on each other, hugging, Lilian trying to reassure her children.

76.     Plaintiffs thought they would remain together.

**D.     U.S. Government Officials Forcibly Separate H.Y.L.F. and B.M.L.F. from Lilian.**

77.     Then, at about 1:00 a.m., after about 24 hours at the Ice Box, CBP officers told Lilian her children would be taken from her and would be placed in the hands of the government.

78.     A CBP officer then took Lilian out of the room where Plaintiffs were imprisoned to speak with a man and a woman who were not wearing CBP uniforms.

79.     Upon information and belief, the man and the woman were employees or contractors of ORR.

80.     The man and the woman told Lilian she would be separated from B.M.L.F. and H.Y.L.F..

81.     They did not tell Lilian where B.M.L.F. and H.Y.L.F. would be taken; only that the government would take them to "another place."

82.      Lilian asked the man and woman if B.M.L.F. and H.Y.L.F. would stay with the government.  The man and the woman told Lilian they would stay with the government, but they refused to provide any additional details.

83.     Sobbing, Lilian begged the man and the woman to let her remain together with her children.

84.     The woman responded, "the laws are the laws."

85.     Lilian then had to tell B.M.L.F. and H.Y.L.F. that they would be separated from her and that she did not know what was going to happen.  Lilian tried to comfort them, but she could not.  Lilian, B.M.L.F., and H.Y.L.F. were all crying.

86.      The woman told Plaintiffs to say goodbye to each other; that they would be separated.

87.     Lilian told the woman, "They are my children.  I can't let them go."

88.     The man and the woman both told Plaintiffs they did not have a choice, and CBP took H.Y.L.F. and B.M.L.F. away from Lilian.

89.     Plaintiffs were distraught.  They did not know why they were getting separated and worried they may never see each other again.

90.     When CBP separated Plaintiffs, H.Y.L.F. was eight years old and B.M.L.F. was twelve years old.

**E.     U.S. Government Officials take H.Y.L.F. and B.M.L.F. to a Shelter in Fullerton, California, Where They Are Separated from Each Other.**

91.     The man and the woman put H.Y.L.F. and B.M.L.F. in the back of a van.  A little girl who was about four years old was in the van with them.

92.     The entire time H.Y.L.F., B.M.L.F., and the four-year-old girl were in the van, they were all crying.

93.     B.M.L.F. asked the man and the woman where his mother was.  The woman said everything would be fine and he should be quiet.

94.     The man and the woman took B.M.L.F., H.Y.L.F., and the four-year-old girl to an airport.

95.     At the airport, another woman came and took the four-year-old girl.

96.     The man and the woman took B.M.L.F. and H.Y.L.F. to an office. The man and woman told them to sit and wait.

97.     B.M.L.F. and H.Y.L.F. waited alone in the office until they were escorted to and boarded a plane.

98.     B.M.L.F. and H.Y.L.F. had no idea where the plane was taking them. They had never been on a plane before.

99.     Over the course of the approximately one hour, forty minute flight, all B.M.L.F. and H.Y.L.F. could think about was that they were getting farther and farther from their mother, who had been their only source of love and support for their entire childhood.

100.    The plane landed at another airport.  Upon information and belief, the airport was in the Los Angeles, California region.

101.    At the airport, two women came and retrieved B.M.L.F. and H.Y.L.F.

from the gate.

102.    B.M.L.F. and H.Y.L.F. still did not know where they were, nor what was going to happen to them.  They were terrified.

103.    The women drove B.M.L.F. and H.Y.L.F. about a half hour to a shelter.  In the car, H.Y.L.F. was crying.  The women did not comfort H.Y.L.F.. They told him to be quiet.

104.    Upon information and belief, the shelter, which Crittenton Services for Children and Families operated, was in Fullerton, California.

105.    At the shelter, some adults separated H.Y.L.F. from B.M.L.F..

106.    H.Y.L.F. was taken to another building at the shelter.

107.    Nobody explained to H.Y.L.F. or B.M.L.F. why they were separated; nor whether or when they would see each other again.

108.    H.Y.L.F. and B.M.L.F. desperately wanted to be with each other. After the trauma of the forced separation from their mother, H.Y.L.F. and B.M.L.F. now thought they would each be taken to different places, and they would be put somewhere dangerous where they could not support or comfort each other.

109.    While H.Y.L.F. and B.M.L.F. were separated, H.Y.L.F. was extremely upset and terrified.  He cried almost incessantly, became ill with a fever, and his entire body ached.

110.    H.Y.L.F. and B.M.L.F. spent the first night at the shelter in separate dormitories with other children they did not know.

111.    The next day, H.Y.L.F. and B.M.L.F. were reunited.

112.    At this point B.M.L.F. realized H.Y.L.F. was sick.  B.M.L.F. was very worried and upset about H.Y.L.F's health.

113.    B.M.L.F. and H.Y.L.F. remained together for the remainder of their time at the shelter.

114.    H.Y.L.F. continued to suffer stress-driven health issues throughout the time he was held at the shelter.  He had severe digestive issues, headaches, and body aches.  He had a hard time sleeping.

**F.    Lilian is ridiculed when she tries to learn information about her children, and she is tricked into signing deportation papers.**

115.    After U.S. government officials forcibly separated H.Y.L.F. and B.M.L.F. from Lilian, she remained a short time at the Ice Box with other mothers who had been separated from their children.  Lilian recalls, "There was a lot of pain in that room."

116.    Lilian then was moved to an ICE detention center near Phoenix, Arizona.

117.    While she was at the detention center, she tried to learn the whereabouts of H.Y.L.F. and B.M.L.F..  She knew they would be terrified and

traumatized without her, and she desperately wanted to comfort them.

118.    Nobody provided Lilian with any information about H.Y.L.F. and B.M.L.F..

119.    Lilian asked one ICE officer, "Excuse me, what are you doing with my children?"

120.    The ICE officer responded, "They're in the hands of the government now.  You won't see them again."

121.    Throughout her detention, Lilian had told several CBP and ICE officers she feared returning to Guatemala and she wanted to apply for asylum.

122.    At the ICE detention center, an ICE officer handed Lilian some forms in English and told Lilian to sign them.

123.    The ICE officer pressured Lilian to sign the forms and did not give her an opportunity to have them translated into Spanish.

124.    Lilian thought the purpose of the forms was to be reunited with her children.

125.    When Lilian asked the ICE officer what the forms were, he laughed at her and told her, "Just sign them."

126.    Lilian signed the forms.

127.    A few days later, an ICE officer told her the forms allowed ICE to deport her.

128.    Lilian told the ICE officer, "I came here looking for protection. What's happening?  You're harming us!"

129.    The ICE officer said, "this isn't my problem."

**G.    Lilian is deported to Guatemala.**

130.    On or about December 12, 2017, ICE forced Lilian onto a plane and deported her to Guatemala.

131.    For the duration of the flight, Lilian was upset and crying.  She was terrified for her children, and she also was worried about her safety once she arrived in Guatemala.

132.    Fearing for her life, Lilian went into hiding once she arrived in Guatemala.

133.    She remained in hiding for four months.

**H.    Lilian is able to communicate with B.M.L.F. and H.Y.L.F., but the communications provide little comfort.**

134.    When Lilian arrived in Guatemala, she did not have any money or a telephone.  Therefore, she had no way to make any inquiries about B.M.L.F. and H.Y.L.F.

135.    Almost a week later, Lilian was able to borrow a phone, and she reached out to Thelma, a family member who lived in the United States, to see if she had heard from B.M.L.F. or H.Y.L.F..  She had not.

136.    Weeks later, Thelma reported she finally had communicated with B.M.L.F..

137.    Shortly after that, Lilian was able to have separate 20-minute calls with B.M.L.F. and H.Y.L.F..  During the calls, B.M.L.F., H.Y.L.F., and Lilian were upset and crying.  Though they were relieved to know, at a basic level, they each were alive—even if not safe—they were very worried about each other.  B.M.L.F. and H.Y.L.F. were scared their father or Lilian's stepfather would find her and harm her.  Lilian could tell B.M.L.F. and H.Y.L.F. felt alone, upset, and scared.

138.    During the calls, Lilian felt like the emotional pain was almost unbearable because she could hear B.M.L.F. and H.Y.L.F., she could tell they were distressed, but she could not see them or hug them.

139.    Over the course of the calls, Lilian learned B.M.L.F. and H.Y.L.F. were depressed and anxious due to the forced separation and isolation.  She learned H.Y.L.F. in particular was becoming self-destructive and suffered from chronic digestive problems as a consequence of the stress.

140.    Lilian was worried B.M.L.F. and H.Y.L.F. would suffer more harm.

141.    Lilian fell into a deep depression.  She felt like B.M.L.F. and H.Y.L.F. first suffered in Guatemala because of the threats and violence, and now they were suffering in the United States, though she brought them to the United States to protect them from the violence.

142.    Lilian thought about suicide.  She called Thelma and told her to take care of B.M.L.F. and H.Y.L.F. if something happened to her.

143.    Lilian could barely eat or hold down food.

144.    She suffered from insomnia because of the anxiety.

**I.      H.Y.L.F. and B.M.L.F. are released to their aunt in Georgia.**

145.    Thelma, having learned H.Y.L.F. and B.M.L.F. were in a shelter, immediately started taking steps to have them released into her custody.

146.    After H.Y.L.F. and B.M.L.F. were forced to live at the shelter without their mother or any other family for approximately three months, they were transported to Atlanta, Georgia and released to Thelma's custody.

147.    Together, H.Y.L.F., B.M.L.F., and Thelma traveled to Trion, Georgia, where Thelma lived.

148.    Though life with Thelma in Trion was better than life in the shelter, it was still emotionally difficult for H.Y.L.F. and B.M.L.F. to be away from their mother.

149.    H.Y.L.F. in particular continued to struggle with digestive issues and insomnia.  His personality changed, and he was quick to anger.

**J.      After renewed threats to her life, and panic-stricken about her children, Lilian again flees Guatemala and enters the United States.**

150.    While Lilian was in hiding, she lived in Tajamulco, a small town in the mountains of western Guatemala.

151.    However, her hometown was San Jose Ojetenam, Guatemala, which was a couple hours by bus from Tajamulco.  This is also where H.Y.L.F. and B.M.L.F.'s father and Lilian's stepfather had lived.

152.    In April or May 2018, she traveled to San Jose Ojetenam to retrieve some documents she needed.  She planned to keep a low profile, and she did not think H.Y.L.F. and B.M.L.F.'s father and her stepfather still lived there.

153.    Unfortunately, her stepfather did live there, and he tracked her down.

154.    Drunk, he kidnapped her, physically assaulted her, and threatened to kill her.

155.    Lilian escaped and fled to Guatemala City, but she learned from an aunt that H.Y.L.F. and B.M.L.F's father was looking for her there.

156.    Terrified that she would be killed, and distraught that she could not be with her children, she decided to try to return to the United States.

157.    In late June 2018, Lilian crossed into the United States near Eagle Pass, Texas and again presented herself to CBP.  She told the CBP officers she

feared returning to Guatemala, and she was looking for her children.

158.    CBP arrested her and, upon information and belief, transferred her to a jail near Del Rio, Texas.  While she was in the jail, she had no way to reach her children.

159.    After about five months in the jail, she was transferred to an ICE detention center in, upon information and belief, Pearsall, Texas.  At the detention center, she was able to work for about one dollar per day.  She saved this money and used it to call H.Y.L.F. and B.M.L.F.  This was the first time she had been able to speak with them since she fled Guatemala.

160.    Because calls were expensive and her earnings in ICE detention were meager, she only was able to speak with H.Y.L.F. and B.M.L.F.  a few times.

161.    ICE imprisoned Lilian for about seven months at the detention center in Pearsall.

162.    ICE officers told Lilian she would be deported to Guatemala again.

163.    On or about July 7, 2019, ICE transferred Lilian to the Irwin County Detention Center ("ICDC") in Ocilla, Georgia.

164.    On August 8, 2019, an immigration attorney was able to secure Lilian's release from ICDC.

165.    Throughout their separation—until the day Lilian was released— Plaintiffs feared they would never see each other again.

**K.     Lilian is reunited with H.Y.L.F. and B.M.L.F., but the harm of their separation continues.**

166.    On the evening of August 8, 2019, Lilian was reunited with H.Y.L.F. and B.M.L.F. in Trion.

167.    Because of the forced separation, Lilian and her children had not seen each other for one year, eight months, and fourteen days.

168.    Lilian continues to suffer the ramifications of the forced separation.

169.    Her relationship with her children, and particularly with H.Y.L.F., is strained.

170.    Lilian has a hard time getting H.Y.L.F.'s attention.  He gets very angry at her and blames her for all of the harm that happened to him.  He frequently asks her why she caused him to be separated from her.

171.    H.Y.L.F. is frequently ill as a result of the emotional trauma and anxiety caused by the separation.  He continues to struggle with gastrointestinal problems, muscle aches, and insomnia.  Because of the health issues, H.Y.L.F. has missed multiple days of school.

172.    This has caused Lilian considerable stress and anxiety.

173.    Lilian constantly deals with feelings of guilt because her children, and particularly H.Y.L.F., suffered psychological harm.

## COUNT I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (All Plaintiffs)

174.    The other paragraphs of this complaint are incorporated as if set forth here.

175.    This Count sets forth claims of all Plaintiffs.

176.    By engaging in the acts described in this Complaint, the federal employees, officials, and contractors referenced above engaged in extreme and outrageous conduct with an intent to cause, or in reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

177.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

178.    The conduct described herein violated Georgia and Arizona law prohibiting intentional infliction of emotional distress.

179.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT II

## BREACH OF FIDUCIARY DUTY

## (H.Y.L.F. and B.M.L.F.)

180.    The other paragraphs of this complaint are incorporated as if set forth here.

181.    This Count sets forth claims of H.Y.L.F. and B.M.L.F..

182.    The federal employees, officials, and contractors referenced above were guardians of H.Y.L.F. and B.M.L.F.

183.    In turn, H.Y.L.F. and B.M.L.F. were wards of the federal employees, officials, and contractors.

184.    As guardians of children housed in federal facilities, these federal employees, officials, and contractors had a fiduciary relationship to H.Y.L.F. and B.M.L.F.

185.    Among their obligations as guardians, the federal employees, officials, and contractors were obligated to act in the best interest of H.Y.L.F. and B.M.L.F.

186.    As described more fully throughout this complaint, these federal employees, officials, and contractors breached these fiduciary duties to H.Y.L.F. and B.M.L.F.

187.    The conduct described herein constituted a breach of fiduciary duty,

in violation of Georgia and Arizona law.

188.    As a direct and proximate result of those breaches, H.Y.L.F. and B.M.L.F. suffered severe emotional distress.

189.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for breach of fiduciary duty.

## COUNT III

## NEGLIGENCE

## (All Plaintiffs)

190.    The other paragraphs of this complaint are incorporated as if set forth here.

191.    This count sets forth claims of all Plaintiffs.

192.    The federal employees, officials, and contractors referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

193.    By engaging in the acts alleged herein, the federal employees, officials, and contractors failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

194.    The conduct described herein constituted negligence, in violation of Georgia and Arizona law.

195.    As a direct and proximate result of the referenced conduct, Plaintiffs

suffered substantial damages.

196.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT IV

## NEGLIGENT SUPERVISION

## (All Plaintiffs)

197.    The other paragraphs of this complaint are incorporated as if set forth here.

198.    This count sets forth claims of all Plaintiffs.

199.    Plaintiffs suffered damages from foreseeable misconduct of employees, officials, and contractors supervised by the Defendant.

200.    The government's employees in supervisory roles have a duty to properly supervise federal employees, officers, and contractors and to oversee their treatment of immigrants in their custody.

201.    The disregard for Defendant's own internal policies and standards by federal employees, officers, employees, and contractors also shows the supervisors were negligent in their non-discretionary duties to supervise individual employees, officers, and contractors.

202.    The conduct described herein constituted negligent supervision, in violation of Georgia and Arizona law.

203.    The government's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Plaintiffs.

204.    As a proximate result of this negligent supervision, Plaintiffs suffered the injuries described herein.

205.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligent supervision.

## COUNT V

## ABUSE OF PROCESS

## (All Plaintiffs)

206.    The other paragraphs of this complaint are incorporated as if set forth here.

207.    This count sets forth claims of all Plaintiffs.

208.    The government's employees, officials, and contractors maliciously abused otherwise legally and properly issued legal processes within their control for purposes the legal processes never were intended to effect: traumatizing Plaintiffs, coercing Plaintiffs to abandon their lawful claims to asylum, and deterring future migrants from seeking refuge in the United States.

209.    The government's conduct described herein constituted abuse of

process, in violation of Georgia and Arizona law.

210.    Plaintiffs. were injured by this misconduct, as described herein.

211.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

## COUNT VI

## LOSS OF CONSORTIUM (ARIZONA)

## (All Plaintiffs)

212.   The other paragraphs of this complaint are incorporated as if set forth here.

213.   This count sets forth claims of all Plaintiffs.

214.   Plaintiffs had a legal right to parent child consortium, which the government's employees, officials, and/or contractor violated.

215.    As a consequence of the government's actions described herein, Plaintiffs lost their capacity to exchange love, affection, society, companionship, comfort, care, and moral support.

216.    The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family in a normally gratifying way.

217.    The government's conduct described herein constituted loss of consortium, in violation of Arizona law.

218.    Plaintiffs were injured by this misconduct, as described herein.

219.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

(1) Compensatory damages;

(2) Punitive damages;

(3) Attorneys' fees and costs; and

(4) Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 22nd day of April, 2021.

*/s/ Daniel Werner*
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE AND FONT

This is to certify that on April 22, 2021, I prepared the foregoing First Amended Complaint in Book Antiqua, 13-point type in accordance with L.R. 5.1(C), and that I electronically filed the document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Daniel Werner
Daniel Werner
Attorney for Plaintiffs